**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00296-CV**
_____

**IN THE INTEREST OF S.P. AND J.P.**

**On Appeal from the 411th District Court**
**San Jacinto County, Texas**
**Trial Cause No. CV15,047A**

**MEMORANDUM OPINION**

After a bench trial, Appellant D.P.[1] ("Daniel") filed an appeal of the trial court's order terminating his parental rights to his minor children S.P. ("Sandra") and J.P. ("Jared"). We affirm.

Background

On August 4, 2017, the Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child

---

[1] To protect the identity of the minor children, we use pseudonyms to refer to the children, their parents, and other family members. *See* Tex. R. App. P. 9.8(b)(2).

1

Relationship ("the Petition"). The Petition named Mindy, Sandra, and Jared as the subjects of the suit; Carrie as the mother of all three children; Daniel as Sandra's and Jared's father; and Jack as Mindy's father. At the time the Petition was filed, Mindy was 6 years old, Sandra was 2, and Jared was 1.

The Petition was supported by an affidavit by a Child Protective Service ("CPS") worker and representative of the Department, and the affidavit stated that, on August 2, 2017, the Department received a report from the sheriff's office concerning an outcry of sexual abuse by Mindy. During a forensic interview, Mindy stated that her stepfather Daniel had used his hand to touch her "private part" more than ten times, that it felt like he was "pushing a nail" into her "private spot[,]" that he asked her to rub his "part[,]" that when she rubs him, something that looked like milk would come out, and that he rubs her behind with his "part[.]" She also stated that Daniel took pictures of her with her clothes off. Mindy stated that she told her mother, but her mother did not listen and did not understand what she was talking about. During a Sexual Assault Nurse Examiner ("SANE") examination two days later, Mindy told the examiner that Daniel had touched her private parts between 25 and 60 times. The SANE exam also revealed that Mindy showed signs of herpes. Carrie told an investigator that there were allegations that Daniel molested Mindy three or four years earlier, that Carrie's mother made the report because she did not

2

like Daniel, but the case was ruled out. Carrie also told CPS that Daniel is never home alone with the children because "he wants to avoid going through this."

A detective at the scene told CPS he did not believe the children should be left with the mother, Carrie would not allow the children to go to her mother's home, and CPS initiated a Parental Child Safety Placement until further investigation could be completed. On August 4, 2017, the trial court found that there was an immediate danger to the physical health or safety of the children or that the children have been the victims of neglect or sexual abuse or trafficking. The Department was named temporary sole managing conservator of all three children.

In the Temporary Order Following Adversary Hearing filed on August 21, 2017, Daniel, Carrie, and Jack were ordered to comply with the requirements of a service plan created by the Department during the pendency of the suit. The order also provided for a Temporary Visitation Schedule for Daniel to have possession of and access to the children.

In a Status Hearing Order filed October 4, 2017, the trial court found that Daniel had not reviewed or signed his service plan. The court also required that visitation between Daniel and Sandra and Jared be supervised. In the Initial Permanency Hearing Order Before Final Order filed on January 10, 2018, the trial court found that Daniel had demonstrated compliance with his service plan. The court also found that visitation between Daniel and Sandra and Jared must continue

3

to be supervised. On May 9, 2018, Carrie filed a motion to sever Sandra and Jared from the lawsuit because there was a pending divorce action between Carrie and Daniel. On June 6, 2018, the trial court granted Carrie's motion to sever. In a Permanency Hearing Order Before Final Order filed on July 20, 2018, the trial court ordered that visitation between Daniel and Sandra and Jared must continue to be supervised.

In a pretrial hearing on October 18, 2018, Daniel's attorney told the court that in light of criminal charges against Daniel,

> Having him going to parenting classes and things of that nature is a waste of everybody's time. Even if he's the best parent in the parenting class, that's not going to change…the Department's position. We would just ask that those portions of the service plan…be abated at this point until further orders of the Court.
> . . .
> I'll get a list, but basically, those -- all of the services that would involve him going to third parties, to classes and things of that nature -- for instance, a psychological -- I don't think I would agree to that as his criminal lawyer because of where that could go. We would ask that those be abated because they're not going to get us anywhere further before the resolution of this plan but also don't want him to be penalized should we have a final hearing and that's the basis for him not -- for being incriminated, is he didn't complete those portions of the service plan.…

The court granted the abatement until the outcome of the criminal case or until Daniel asked for it to be unabated. In Permanency Hearing Orders Before Final Order filed on November 14, 2018 and on January 24, 2019, the trial court noted

that Daniel's service plan had been abated and that supervision between Daniel and Sandra and Jared must be supervised.

The trial court entered a Final Order in Suit Affecting the Parent-Child Relationship on June 13, 2019. Therein, the court appointed Carrie, Daniel, and an intervenor (the children's maternal grandmother) as possessory conservators of Sandra and Jared, and the order provided for "no possession and access" by Daniel of the children.

In a November 14, 2019 hearing on placement of the children, Appellant was not present, and the court stated

> [Daniel] doesn't want to be involved in this portion of the case.
> . . . .
> All of the criminal charges are still pending against [Daniel] concerning the children. [Daniel's attorney] thought, on behalf of his client, it best if they do not participate in this portion of the case.
> . . . .
> [T]here's bond conditions that [Daniel] is subject to also.

The Department requested the court order that Daniel have no contact with the children. In a January 9, 2020 hearing, Carrie testified that she had not let Daniel have any contact with the children.

In a November 5, 2020 hearing, the trial court again stated that Daniel and his attorney had given "permission to proceed without him[]" and that Daniel and his attorney were not participating in the CPS case based on the criminal charges Daniel was facing. Counsel for the Department also told the court that Daniel was in the

5

Montgomery County jail. A CPS caseworker also testified that she had not visited with Daniel, but the caseworker had "monitored him through VINELink" to ensure that he had not been released from jail and to know how to contact him. On June 7, 2021, the Department filed an Amended Petition seeking termination of Daniel's parental rights as to Sandra and Jared and the appointment of Carrie as Sandra and Jared's managing possessory conservator.

Testimony at Trial

In August 2021, the case was tried to the bench. The Department sought appointment of Carrie as sole managing conservator of the children and termination of Daniel's parental rights pursuant to the Amended Petition. The trial court took judicial notice of the court's file in this case, CPS status reports filed with the court, and service plans for Daniel that were made orders of the court in September and November 2017.

Testimony of Keflyn Wilridge

Keflyn Wilridge, a CPS caseworker, testified that he was the caseworker assigned to this case for "several months." Wilridge agreed that a family service plan for Daniel had been court-ordered, he had contact with Daniel about the service plan, but he had not observed any contact between Daniel and Sandra and Jared. Wilridge did not know whether Daniel had signed the family service plan. According to Wilridge, while he was assigned to the case, Daniel would have had the ability to

6

work on his service plan. Wilridge testified that when he approached Daniel about the service plan, Daniel stated that he was not going to comply, and "he stated that he had a felony and he wasn't going to get his kids back and he wasn't going to work the service plan." Wilridge agreed that he explained to Daniel that the service plan was "something that the court had ordered" and he believed that Daniel understood it was court-ordered.

Testimony of Anita Sykes

Anita Sykes testified that she was currently a supervisor with the Department, she was a caseworker when she was assigned to this case, and she had direct supervision of this case from November 2019 to April 2021. Sykes testified that she was aware of the service plan for Daniel, but she had not created it. Sykes understood that Daniel had been arrested in Montgomery County for sexual assault of a child, he fled to another state, he later was placed back in jail in Montgomery County, and at the time of trial, he was facing charges in two counties for the same conduct against two victims. According to Sykes, Daniel was out on bond when she was assigned to the case in November 2019. Sykes was not aware of a second service plan for Daniel that was developed in November 2017. She had not observed any contact between Daniel and Sandra or Jared. Sykes agreed that the Department had deemed Daniel to have constructively abandoned Sandra and Jared. Sykes was not aware that Daniel had completed any of the items on his service plan as of April 21,

7

2021. According to Sykes, Daniel had not had any contact with the children—whether in person, by phone, or in writing—between November 2019 and the time of trial, and he had not contacted the Department to ask for a status update, information about the children, or photos. Sykes testified that for about six or seven months during the case, Daniel was not incarcerated, but he did not contact her to work on his service plan, to ask about the children, or to acknowledge the case, and he had not attempted to work the service plan. Sykes also testified that Daniel knew that he needed to work his service plan and that some services are available in some jails. Sykes agreed that it was in the best interest to terminate Daniel's parental rights based on abandonment, failure to comply with the service plan, and the children's best interest, even if he were to be found not guilty on both criminal cases, and that if Daniel's parental rights were not terminated, there is a potential for continuing danger to the children.

On cross-examination, when asked whether she knew that one of the conditions of Daniel's bond required him not to have contact with the children, Sykes replied that she did not know the conditions of his bond and that

> [h]e could have called me to see how they were doing. He could have called the Department to see how they were doing. He could have [written] letters. There [were] ways to communicate with the children.…
> . . . .
> [H]e could have contacted me to see how they were doing, make sure they were okay, even just to get pictures of them.
> . . . .

8

> …I'm the Department. I'm not the children nor the family. I could have given him updates on the children, how they're doing in school, whether they've been sick, whether they're healthy, whether they're happy, whether they've asked about him.

According to Sykes, Daniel had been under investigation for the whole time of the case, but he had not been in jail the entire time. Sykes did not know whether Daniel had had the opportunity to have access to his children during the pendency of the case, given the allegations against him. Sykes testified that she had previous cases involving bond conditions of a respondent with a criminal case, and that the respondent or his attorney can request further visitation and a subsequent court order would "line up with a bond condition[.]" But Sykes was not aware of any request in this case by Daniel or his attorney to step up visitation. Sykes agreed that not requesting photos, status updates, or contact with the children was consistent with constructive abandonment.

Testimony of Tiffany Pecero

Tiffany Pecero, a caseworker for the Department, testified that she was assigned to the case early in 2021 when Sykes was promoted to supervisor. According to Pecero, she went to see him in June and was not able to contact him. Pecero also testified that, since she had been assigned to the case, Daniel had not contacted her regarding his service plan, contacting the children, or status updates on the children. Pecero agreed that upon request, the Department would attempt to provide status updates on the children.

<u>Testimony of the Court-Appointed Special Advocate</u>

The Court-Appointed Special Advocate ("CASA") in this case testified that she had been on this case since September 2017, she had had no contact with Daniel, and he had not had any interaction with the children. The CASA testified that Daniel had not requested additional visitation with or access to the children nor had she received assistance from his attorney in setting up visitation. The CASA was also not aware that Daniel had done any work towards his service plan. The CASA testified that she believed that termination of Daniel's parental rights was in the best interest of the children because

> …he's not asked for any kind of contact with the children whatsoever. In fact, he's said he didn't want to have contact with the children.…
> . . . .
> He's made no effort.…
> . . . .
> I just don't think he needs to be in contact with these children because they haven't seen him in four years, over four years. They don't know who he is.

The CASA testified that, to her knowledge, the children had never asked about their father. The CASA agreed that at one point during the case, the Department agreed to give the parents additional time to work their service plans. The CASA did not know what Daniel did or did not do on his service plan and she did not know what the conditions of his bond were. The CASA agreed that in an agreement among the parties in 2019, Daniel agreed to have no possession of the children, that agreement

was not an adjudication of the court, and that in the trial, the Department was "asking to change no possession to termination of parental rights[.]"

Testimony of Carrie

Carrie testified that she was still married to Daniel at the time of trial, that Daniel had "refused to sign[,]" and she could not complete the divorce until the children were situated. Carrie also testified that, shortly after this case began in 2017, she was criminally charged for helping to hide Daniel when there was a warrant for his arrest. She also agreed that she was familiar with the family service plan for Daniel. According to Carrie, Daniel had not made a request to see the children nor asked for increased visitation, but he had tried to see the children by "[s]neaking around [her] house[,]" and she had to install cameras at her house "because he was trying to stalk [her] and have people come follow [her.]" Carrie testified that she had completed her service plan even though there was a criminal charge against her and she was on community supervision, but she was not aware of whether Daniel had participated in his service plan. She also testified that Daniel had not provided for the children's welfare during the case. Carrie testified that since the children had been placed with her, she had not received phone calls, letters, or child support from Daniel, and the children have not asked to see him.

11

Daniel's attorney told the court that although he was "quite eager to testify," that she advised him to assert his Fifth Amendment right against self-incrimination in light of the two pending cases for sexual assault of a child.[2]

After the bench trial, the trial court entered a Final Order in Suit Affecting the Parent-Child Relationship on September 9, 2021. Therein, the trial court terminated Daniel's parental rights to Sandra and Jared, having found that termination was in the children's best interest and that Daniel had constructively abandoned the children pursuant to section 161.001(b)(1)(N) of the Family Code and had failed to comply with the court-ordered service plan pursuant to section 161.001(b)(1)(O) of the Family Code.[3] Daniel timely filed a notice of appeal.

## Issues

Appellant raises three issues on appeal. Appellant's first issue argues that the trial court erred in terminating his parental rights under subsection N because there was a court order that Appellant have no access to or communication with the children, and the order was never lifted prior to the final hearing. Appellant's second issue argues that the trial court erred in terminating his parental rights under subsection O because Appellant's participation in the family service plan was abated

---

[2] Attorneys for Carrie and for the intervenor grandmother told the court that Daniel had been arrested on a second sexual assault of an unrelated child after this case began.

[3] The trial court also appointed Carrie permanent managing conservator of Sandra and Jared and the maternal grandmother as possessory conservator.

by the trial court due to Appellant's pending criminal charges and never reinstated prior to the final hearing. Appellant's third issue argues that the trial court erred in terminating his rights under subsection O because no family service plan was ever filed with the court or entered into evidence.

An appellate brief must include "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(i). In this case, Appellant's brief identifies three alleged issues, but the brief fails to identify the applicable law or legal standard for each issue and also fails to explain how the trial court erred with reference to the record or applicable law. An appellate brief must explain how the law in the cited authorities applies to the material facts in the record and supports the appellant's arguments on appeal. *See Schmitz v. Denton Cty. Cowboy Church*, 550 S.W.3d 342, 363 (Tex. App.—Fort Worth 2018, pet. denied). "An appellate court has no duty to perform an independent review of the record and applicable law to determine whether the error complained of occurred." *Strange v. Cont'l Cas. Co.*, 126 S.W.3d 676, 678 (Tex. App.—Dallas 2004, pet. denied). By providing only bare assertions of error or allegations, we conclude Appellant's brief fails to satisfy Rule 38.1, the brief presents nothing for our review on appeal, and Appellant waived our review of those complaints. *See In re J.W.*, No. 09-20-00204-CV, 2021 Tex. App. LEXIS 3040, at **6-7 (Tex. App.—Beaumont Apr. 22, 2021, no pet.) (mem. op.); *see also Fredonia State Bank v. Gen.*

13

*Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) ("a point may be waived due to inadequate briefing[]"); *Washington v. Bank of N.Y.*, 362 S.W.3d 853, 854 (Tex. App.—Dallas 2012, no pet.) (bare assertions of error, without argument or authority, present nothing for review on appeal); *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (concluding that appellant waived its complaints by failure to brief and "merely uttering brief conclusory statements, unsupported by legal citations[]"). Nevertheless, in the interest of justice, we may construe Appellant's issues to challenge the sufficiency of the evidence to support the trial court's final order as to the predicate grounds for termination, and we address the sufficiency of the evidence to support the trial court's findings under subsection N. *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) ("[A]ppellate courts should reach the merits of an appeal whenever reasonably possible.") (citing *Verburgt v. Dorner*, 959 S.W.2d 615, 616 (Tex. 1997)); *see also* Tex. R. App. P. 33.1(d) (in a civil case tried to the bench, a complaint about the sufficiency of the evidence may be made for the first time on appeal); *In re H.D.M.*, No. 09-18-00050-CV, 2018 Tex. App. LEXIS 4339, at *16 (Tex. App.—Beaumont June 14, 2018, pet. denied) (mem. op.) (same).

## Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code,

14

"'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a

15

factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.); *In re R.J.*, 568 S.W.3d 734, 754 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). Only one statutory ground under section 161.001(b) is required to terminate parental rights. *See In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019).

Subsection N: Constructive Abandonment

As previously noted, the trial court found that two statutory grounds for termination were established by clear and convincing evidence. First, it found that Daniel constructively abandoned Sandra and Jared under section 161.001(b)(1)(N). Second, the court found that Daniel had failed to comply with the provisions of his court-ordered service plan under section 161.001(b)(1)(O). When termination is based on multiple grounds under section 161.001(b)(1), as it was here, we must affirm the termination order if the evidence is sufficient to support any one of the grounds found by the district court. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also In re Z.M.M.*, 577 S.W.3d at 542 (explaining that only one statutory ground is required to terminate parental rights). Because a finding regarding constructive

16

abandonment is dispositive, we confine our analysis to the evidence material to that statutory ground. *See* Tex. R. App. P. 47.1.

Subsection N provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has constructively abandoned (1) a child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months; (2) the Department has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N). "If there is no evidence of one or more of these elements, then the finding of constructive abandonment fails." *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied); *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(N); *In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.).

Appellant does not argue that there was evidence that he visited or contacted the children. Rather, he argues that he was ready and able to visit his children, but his counsel argued that doing so could jeopardize his criminal case, and he did not have an opportunity to contact the children during the pendency of the case. According to Appellant, the Department did not make reasonable efforts to return the children to him and by agreement of all parties, he was under no duty to visit,

17

maintain contact with, or to provide a safe living environment for the children until the criminal case against him was resolved. Appellant further argues that "[t]he parties in the case seemed to agree that Appellant's participation in the case was not recommended while his criminal case was pending." In addition, Appellant argues that the Final Order in Suit Affecting the Parent-Child Relationship entered on June 13, 2019 "specifically precluded Appellant from possession of or access to the children[,]" which Appellant states was "due to the pending criminal case and bond conditions." Appellant's conditions of bond are not in our appellate record, nor does Appellant's brief provide any citations to the record for this assertion. *See* Tex. R. App. P. 38.1(i). And the record reflects that the parties agreed to entry of an order that "the children at no time are introduced into contact with [Daniel.]"

The first two elements in proving constructive abandonment focus on the Department's conduct; the remaining elements focus on the parent's conduct. *In re X.A.S.*, No. 05-19-01082-CV, 2020 Tex. App. LEXIS 1825, at *7 (Tex. App.—Dallas Mar. 3, 2020, no pet.) (mem. op.). When reviewing whether sufficient evidence supports termination under subsection N, as to the efforts of the Department, the issue is whether the Department made reasonable efforts, not ideal efforts. *Id.* (quoting *In re F.E.N.*, 542 S.W.3d 752, 766-67 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)); *In re G.K.G.A.*, No. 01-16-00996-CV, 2017 Tex. App. LEXIS 5071, at *14 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied)

(mem. op.). When the Department removes a child, it designs a family service plan to reunify the parent with the child. *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 795 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Preparing and administering a service plan for the parent constitutes evidence that the Department made reasonable efforts to return the child to the parent. *See In re A.M.E.*, No. 01-21-00214-CV, 2021 Tex. App. LEXIS 8094, at *14 (Tex. App.—Houston [1st Dist.] Oct. 5, 2021, no pet.) (mem. op.) (citing *Liu*, 273 S.W.3d at 795; *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.)); *In re I.M.*, No. 01-21-00123-CV, 2021 Tex. App. LEXIS 7246, at **11-12 (Tex. App.—Houston [1st Dist.] Aug. 31, 2021, no pet.) (mem. op.); *C.G. v. Tex. Dep't of Family & Protective Servs.*, No. 03-18-00852-CV, 2019 Tex. App. LEXIS 6435, at **21-22 (Tex. App.—Austin July 26, 2019, no pet.) (mem. op.).

The Department established that Sandra and Jared came into its care and that it was named the children's sole managing conservator on August 4, 2017. The children continued in the Department's custody until the final modification hearing in April 2021. Therefore, Sandra and Jared had been in the Department's conservatorship for at least six months. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N).

CPS caseworkers Wilridge, Sykes, and Pecero testified that the Department had developed a service plan for Daniel. Daniel's attorney asked the court to abate

19

portions of his service plan that involved Daniel going to classes or otherwise going to third parties in light of the unresolved criminal charges against him. A temporary order filed August 21, 2017, ordered Daniel to comply with the Department's service plan. A Status Hearing Order filed October 4, 2017, noted that Daniel had not reviewed or signed his service plan and also stated that the court had reviewed the service plans for Carrie and Daniel and found them reasonable and accurate. In another order filed on January 10, 2018, the trial court found that Daniel had demonstrated compliance with his service plan. Therefore, the record provides clear and convincing evidence that the Department had prepared a service plan for Daniel, and the Department's implementation of a service plan is considered a reasonable effort to return the children to the parent under subsection N. *See In re I.M.*, 2021 Tex. App. LEXIS 7246, at \*\*11-13.

The third element requires proof that the parent failed to regularly visit or maintain significant contact with the child. In this case, there was no evidence that Daniel had any contact with Sandra and Jared except for Carrie's testimony that Daniel had tried to see the children by "[s]neaking around [her] house." Daniel's brief does not argue that he tried to have contact with Sandra and Jared but that the lack of contact was excused because his service plan was abated on the advice of counsel due to pending criminal charges.

Subsection N is silent about the voluntariness of a parent's failure to regularly visit or maintain significant contact with his children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N)(ii); *In re I.D.*, No. 05-21-00244-CV, 2021 Tex. App. LEXIS 7695, at **11-12 (Tex. App.—Dallas Sep. 17, 2021, pet. denied) (mem. op.). Other courts have determined that a trial court may conclude that a parent has failed to regularly visit or maintain significant contact with the children under subsection N even though the parent's visitation rights were abated by the court or there was a court order requiring a parent not have contact with the children. *See Nuyen v. Tex. Dep't of Family & Protective Servs.*, No. 03-12-00147-CV, 2012 Tex. App. LEXIS 7180, at **14-17 (Tex. App.—Austin Aug. 23, 2012, no pet.) (mem. op.); *Quiroz v. Dep't of Family & Protective Servs.*, No. 01-08-00548-CV, 2009 Tex. App. LEXIS 2405, at **17-18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.). The Houston First Court of Appeals explained that a district court's order requiring no contact between the parent and child until the parent's other children were brought into the Department custody did not mean the parent could not see her child "based on factors beyond her control," and "by the very nature of the order, [the parent] only had to come to court in order to have the order lifted." *Quiroz*, 2009 Tex. App. LEXIS 2405, at **17-20.

Where a parent's own actions caused the inability to visit his or her children, a trial court may conclude there is clear and convincing evidence that the parent

failed to regularly visit or maintain significant contact with the children under subsection N. *See In re K.P.*, No. 11-20-00001-CV, 2020 Tex. App. LEXIS 5325, at **6-8 (Tex. App.—Eastland July 15, 2020, no pet.) (mem. op.) (concluding the evidence of abandonment was clear and convincing evidence even though mother argued she failed to regularly visit or maintain significant contact with the children after removal because the trial court had prohibited her from visiting the children due to a positive drug test result, which was a matter within mother's control). Evidence in the record indicated that Daniel made no effort to contact the Department and to seek updates or information about the children, even if his criminal court bond conditions may have required that he have no personal contact with the children. On this record, the trial court could have found that, as a result of his own actions and indifference, Daniel failed to regularly visit or maintain significant contact with Sandra and Jared. *See id.*; *In re G.K.G.A.*, 2017 Tex. App. LEXIS 5071, at *16.

The final element requires evidence that Daniel demonstrated an inability to provide the children with a safe environment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N)(iii). The Department bears the burden to prove the parent is unable to provide a safe environment for the children. *See In re A.S.*, 261 S.W.3d 76, 90 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re D.T.*, 34 S.W.3d at 641. Daniel does not challenge this element on appeal, and the appellate record

includes no evidence that Daniel attempted to demonstrate his ability to provide a safe environment for the children.

Incarceration alone does not prevent a parent from providing a child a safe environment. *See In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.). An incarcerated parent may be able to work through spouses, relatives, or friends to fulfill the obligation to provide a safe environment. *See id.* However, in this case, there is no evidence that Daniel made any efforts to ensure or provide a safe environment for Sandra and Jared by his own efforts or through the use of others. Sykes testified that Daniel had not contacted the Department to inquire about the children, had not acknowledged the case, and had made no attempt to work his service plan. Pecero testified that the Department would attempt to provide status updates on the children, but that Daniel had not contacted her regarding the children or his service plan. Carrie testified that she was trying to divorce Daniel, and he had not provided her with any support for the children's welfare during the case. According to Carrie, she had not received phone calls, letters, or child support from Daniel during the pendency of the case. The trial court could have determined based on the record that the Department met its burden to prove that Daniel had demonstrated an inability to provide a safe environment for Sandra and Jared. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N)(iii).

23

We conclude that the evidence, viewed in the light most favorable to the trial court's finding under subsection N, is such that a reasonable factfinder could have formed a firm belief or conviction that Daniel constructively abandoned the children. Considering all of the evidence in the record, both supporting and contradicting the constructive abandonment finding, the trial court could have formed a firm belief or conviction that Daniel constructively abandoned Sandra and Jared. *See In re J.O.A.*, 283 S.W.3d at 344-45; *In re J.F.C.*, 96 S.W.3d at 266; *In re G.K.G.A.*, 2017 Tex. App. LEXIS 5071, at *18.

Having concluded the evidence was sufficient to support termination under subsection N, we need not address the sufficiency of the evidence under subsection O. *See* Tex. R. App. P. 47.1; *In re Z.M.M.*, 577 S.W.3d at 542; *In re A.V.*, 113 S.W.3d at 362. We overrule all of Appellant's issues on appeal, and we affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on January 11, 2022
Opinion Delivered February 3, 2022

Before Golemon, C.J., Kreger and Johnson, JJ.